I. N. JEFFRIES, Receiver, Appellant, v. EDWARD W. TEALE et al.,
Appellees.

No. 42225.

JUNE 23, 1934.

G. F. Hoffman, for appellant.

T. W. Miles, for appellees.

EVANS, J.—Facts which equity ordinarily regards as badges of fraud are primarily quite prominent in this case, and these are relied on as the requisite proof in support of the allegations of the petition. Teale had three sons, viz., A. L. Teale, Chet L. Teale, and Wallace J. Teale. Edward was surety for his son, A. L. Teale, on a note for $1,500 held by the Farmers Bank. It is claimed by defendants that he was debtor to his son Chet Teale for $2,000, and to his son Wallace to the amount of $500. He was also debtor to the Farmers Bank on a note for $550. A. L. Teale was the oldest of his sons, and Wallace the youngest. The evidence of his alleged debt to the son Chet was a note dated in 1913. The debt for which this note was given was incurred in 1910. In 1910 Chet was 22

years of age, unmarried, and living at his, father's home. The debt represented by the $2,000 note included wages for a year's service, and $800. of money loaned. The note when given was left in the hands of the father in the sense that it was kept throughout all the years in the father's safe. For 60 years the father has had his residence at Davis City, Iowa. Beginning in 1910 he was in the automobile business, operating a garage until the year 1920. In 1921 he became postmaster of Davis City. The note carried seven annual indorsements of interest written thereon by the father. These purported indorsements extended from December 1, 1914, to December 31, 1920. Each indorsement was for $160 and purported to be paid as interest on the note. It carried also the following notation written across the face thereof: "Paid February 26, 1932. Deed to land and house." No interest purported to be paid after December 31, 1920.

The note to Wallace Teale was for $500 dated January 4, 1928, due in one year after date, with annual indorsements of interest at $40 indorsed thereon in January, 1929, 1930, and 1931. Across the face of the note was this notation: "Paid February 26, 1931. Deed to house and lot." This note also was kept in the father's safe during all the years of its existence. Wallace was assistant postmaster under his father. He obtained his compensation through his father. The larger part of the consideration claimed for this note consisted of his compensation which the father had been permitted to retain. There was also an item of $100 of money loaned to his father. The Farmers Bank went into the hands of the receiver, present plaintiff, on February 26, 1931. The conveyances by Teale to his sons were made on the date following.

The property of Edward Teale consisted of his home and two small properties, all in Davis City, and 40 acres of farm land adjoining thereto. The land was found to be worth from $40 to $50 per acre. The town properties were of very small value and difficult to appraise. The conveyance to Chet comprised the 40 acres of farm land and the homestead of the grantor. The conveyance to Wallace comprised the small house and lot. As against Chet, the petition asks only that the conveyance of the 40 acres be set aside. As against Wallace, it asks that the conveyance be wholly set aside as to all the property conveyed to him. The foregoing discloses fully the badges of fraud relied on by the appellant. The argument of appellant naturally is that an indebtedness 20 years of age

is a sorry foundation for the support of a conveyance by an insolvent to his own son. The argument is legitimate. The badge here shown calls for an affirmative showing by the defendant of the genuineness and the honesty of the instruments which evidence the alleged indebtedness. The argument is devoted principally to the conveyance to Chet, and to that we give our first attention.

It is naturally contended that a boy 22 years of age, living at home, is not ordinarily a money loaner to his father. The fact that the note is alleged to have been in the father's safe during all the years is on its face an impeaching circumstance. The existence of the debt from Edward to his son is a fact vital to the sustaining of this transaction. On the other hand, if that fact be satisfactorily proved, it becomes decisive of the right of the defendant to sustain this conveyance. If the father was actually owing his son the note, as claimed, then there can be no doubt of the right of both debtor and creditor to work a preference in favor of the son. The anchor post then of the case is: Was there honestly and in good faith an existing indebtedness from father to son?

In 1910 Edward went into the automobile business and operated a garage, and so continued for ten years. A part of this time he operated two garages; one at Leon and one at Davis City. He maintained his home at all times at Davis City. At that time the son Chet had a job at Des Moines at a wage of $100 a month. His father induced him to come home and become the auto mechanic in his garage at the same wage that he was receiving in Des Moines. He did return, and he did serve his father for the period of one year. By mutual consent his father was allowed to retain his wages. Not only so, but at the beginning of the year of his service, and about April, he loaned his father $800. At the end of the year Chet decided to go back to his old job, and this he did. Up to that time he had had no settlement with his father. In October, 1913, he was married. In November he had a settlement with his father which resulted in the note now involved here. The father paid him 8 per cent interest thereon for 7 years. This was up to the time that the father became postmaster. The indorsements stopped at that date. Chet continued on his former job at Des Moines for some years. He later became a resident of Lake Park, Iowa, and lived there at the time the conveyance was made, which is now under attack. The indorsements of interest on the note indicated by their appearance that they were not made simultaneously. In his written

findings the trial judge found specifically to that effect. The note has not been certified to this court, and the indorsements have not been submitted to our inspection. We assume, therefore, that this finding by the trial judge is not contested here. That being true, the claim that the indorsements were fictitious would be a virtual claim that the father had been consciously preparing for this alleged fraudulent conveyance for many many years.

The circumstances immediately attending the conveyance were that the father was very ill and had been so for several months and was confined to his home and bed. He was not able to give personal attention to the making of the conveyances, other than to sign the same. His illness continued for several months thereafter. It is quite manifest that he was not at that time physically able to make false entries or to create fabricated evidence.

The circumstances attending the creation of his indebtedness at the Farmers Bank were that he was asked to sign as surety the $1,500 note of his son, A. L. Teale. This indebtedness had existed for many years prior to that time, and had been carried by successive renewals. The signing of the note by the father was treated as something of a mere formality both by the bank as well as by Teale himself. It had been past due for some years, without renewal. No notice or demand had ever been made upon the father concerning the note since he signed it. Like the average surety, he supposed the principal would take care of it, and that he *was* taking care of it. His note for $550 was accepted by the bank in settlement of his own indebtedness. On that note he made a payment of $222 since the receivership. His only existing primary indebtedness is $350, if we assume that his indebtedness to his boys has been canceled by the conveyances. In considering the story of Chet's note, the greatest presumptive improbability attaches to that part of it concerning the loan of $800 in April, 1910. Chet was ably cross-examined on that feature of the case, and testified without reservation at any point. He had been earning $100 a month for an indefinite period prior to his employment by his father. He testified in response to the cross-examiner that he paid the amount to his father by check on the *Farmers Bank*. If he was willing to testify falsely at this point, it is rather inconceivable that he would testify so unwisely as to expose himself to immediate contradiction by the bank officials and by their books. The officials of the bank in 1910 were substantially the same as they were at the closing of the bank,

and they were all called as witnesses in this case. Each of them testified with commendable candor. If Chet paid his father a check in 1910, the necessary inference therefrom was that he had a deposit in the Farmers Bank against which he checked. Such a claim, if false, could have been disproved by the bank's books. If these had not been available, it could have been disproved by the testimony of the officials themselves. The payment by them of a check might be forgotten in the long years, it is true. But the fact that the boy had ever been a depositor in the bank, or had not, could not likely be obliterated in the memory of *all* the officials. None of the officials were interrogated on this question. Neither contradiction nor qualification was offered. Whether they still had the records of that time was not disclosed. To our minds this evidence, uncontradicted and unqualified by the plaintiff's officials, is very persuasive in support of the genuineness of the note.

When the witness testified that the loan made by him to his father was in the form of a check on the *Farmers Bank*, he put his head, so to speak, into the mouth of the lion, and staked it upon the verity of his testimony. Lions in lawsuits usually perform their functions. We must hold at this point, therefore, that the books of the Farmers Bank sustained this testimony of the witness, and that the fact was incontestably proved.

The circumstance that the notes of both the boys were kept in the father's safe, and in that sense were left in his possession, is not a formidable circumstance. Each of them had other papers, and they were all kept in their father's safe. It is seldom true that every member of a family has a safe. There was no practical reason which could be apparent to any of them why they could not use their father's safe. If they were simply creating false evidence for the purpose of sustaining a future fraud, they would have been more likely to question the wisdom of such a custody.

The deed to Chet included the homestead. There was no occasion for including the homestead in the conveyance if the purpose thereof was to defeat creditors. On the contrary, it tends to show the motive of the conveyance was the father's concern for the payment of the debt he had owed so long to his son. He was under a severe illness at the time, and his apprehensions for the future might have been the stimulus to the conveyance. It appears that after the conveyance and after the deed had been sent to Chet at his home at Lake Park, Chet came to Davis City. At that time it

was orally agreed between Chet and his father that the parents should not be disturbed in the possession of their homestead during their life, on condition only that upkeep and taxes should be assumed by the father. Appellant contends that this was a badge of fraud. It was a matter of indifference to the plaintiff whether the homestead was included or omitted from the conveyance. He claims no relief as against the homestead. The subsequent understanding between father and son had no effect upon the rights of the plaintiff, and we see nothing sinister in it as a badge of fraud.

Improbable as it seemed upon first impression, we are fully convinced of the genuineness of the $2,000 note and of the consideration behind it. We are equally convinced of the genuineness of the consideration in the note held by Wallace. The trial court gave a very careful consideration to the case, and filed a very painstaking opinion therein in support of his decree in favor of the defendants. We find ourselves in full accord with it.

The decree below is accordingly affirmed.

All Justices concur.